Olga A. BOSMA, Plaintiff, Appellant,
and Cross-Appellee,

v.

Alvin A. BOSMA, Defendant, Appellee,
and Cross-Appellant.

Civ. No. 9650.

Supreme Court of North Dakota.

Nov. 28, 1979.

Rehearing Denied Jan. 10, 1980.

Murray, Olson, Larivee & Bohlman, Grand Forks, for plaintiff, appellant, and cross-appellee; argued by Bruce E. Bohlman, Grand Forks.

R. Lee Hamilton, Grand Forks, for defendant, appellee, and cross-appellant.

ERICKSTAD, Chief Justice.

The plaintiff appeals from a judgment of divorce entered in Grand Forks County District Court on May 18, 1979. The judgment is reversed as to omitted property, but it is otherwise affirmed.

The plaintiff, Olga A. Bosma, and the defendant, Alvin A. Bosma, were married in Crookston, Minnesota, on December 1, 1951. Three children were born of the marriage: Larry Bosma, born June 19, 1952; Katherine Bosma, born March 20, 1955; and Denise Bosma, born February 23, 1967.

The evidence indicates that the parties had experienced marital problems for quite some time, and matters worsened considerably following the birth of their youngest child, Denise.

Olga commenced an action for divorce by service of the summons and complaint upon Alvin on January 25, 1978. The asserted grounds for the divorce were that Alvin had inflicted grievous mental suffering and cruelty upon Olga which made the continuance of the marriage intolerable.

In Alvin's answer to the complaint, he asserted a counterclaim, alleging that Olga had inflicted grievous mental suffering and cruelty upon him, and furthermore, that the parties had irreconcilable differences which made the continuance of the marriage intolerable.

A hearing was held on September 21, 1978, with additional hearings thereafter. On May 17, 1979, the court issued its findings of fact, conclusions of law, and order for judgment, awarding Alvin a decree of divorce on the grounds of irreconcilable differences.

Based upon the evidence adduced at trial, the district court concluded, in pertinent part, in its findings of fact that:

"XII.

"The parties were possessed of a net worth of $202,701.00 as of July 1, 1978. The sum of $169,827.00 of this net worth consisted of equities in certain real property in Grand Forks and Maple Lake, Minnesota. The equities represent interest in real property having a total value of $334,500.00 and subject to indebtedness of $164,673.00. . . .

\* \* \* \* \* \*

"XVI.

"Neither the Plaintiff nor the Defendant have established a cause of action for divorce on the grounds of extreme cruelty, as specified in Sections 14–05–03(2) and 14–05–05 of the North Dakota Century Code."

Thereafter, in its conclusions of law, the district court made the following awards of alimony, child support, and the division of property:

"IV.

"The Defendant shall pay to the Plaintiff as and for child support of the minor child born of the marriage the sum of Two Hundred ($200) Dollars per month, payable on the 15th day of each month, commencing May 15, 1979 and each month thereafter until the child reaches her majority, or until further order of the Court. The said payments shall be made to the Clerk of the Grand Forks County District Court, Grand Forks, North Dakota.

"V.

"The Plaintiff is awarded the following property, free and clear of any claims of the Defendant:

(a) The 1976 Cadillac automobile, subject to encumbrances thereon, and the 1970 Chevrolet automobile;

(b) All of the personal property now in her possession, including the lumber for the fence at 3114 10th Street South, Grand Forks, North Dakota;

(c) The parties' lake property at Maple Lake, Minnesota;

(d) Subject to the conditions set forth in this paragraph, the Plaintiff is awarded the residence at 3114 10th Street South, Grand Forks, North Dakota, subject to the encumbrances thereon as shall remain unpaid to the date of February 23, 1985. During the interim period from the date of the commencement of this action to February 23, 1985, and so long during said period as the said property is occupied by the Plaintiff as custodial parent and by Denise Bosma, the Defendant shall be fully obligated to make all necessary payments on said property to cover real estate taxes assessed and payable thereon, including installments of special assessments as shall have been extended of record by said date. The Defendant is also ordered to maintain adequate fire insurance on said property until that date and make all payments of principal repayment and interest as shall accrue on the note secured by the mortgage against said property. The object of these payment obligations upon the Defendant during this period is to provide a homestead for the minor child of the parties during the remainder of her minority. In the event that the Plaintiff shall quit the described premises during the minority of Denise Bosma, the obligations of Defendant to make payments thereon for the

benefit of Plaintiff as custodial parent shall cease and such payments shall thereafter be the obligation of the Plaintiff. In any event, after February 23, 1985, the obligations for payment of taxes, insurance, principal repayment and interest shall be that of the Plaintiff;

(e) The Plaintiff is also awarded all of her personal effects and other personal property presently in her possession and in addition thereto shall have all household goods presently in her possession, free of claims of the Defendant;

(f) The Plaintiff is also awarded the 1957 boat, motor and trailer, the tractor and such other tools and equipment as may be located at the residence at 3114 10th Street South or at the parties' Maple Lake, Minnesota property as of April 17, 1979;

(g) The Plaintiff is also awarded the rental real estate located at 623 Lincoln Drive and at 416/418/420 Conklin Avenue, subject to the encumbrances thereon, but free and clear of claims of the Defendant. Income returnable thereon shall be in lieu of alimony for the Plaintiff. The property is located in Grand Forks, North Dakota.

"VI.

"The Defendant is awarded all other property of the marriage free and clear of the claims of the Plaintiff.

"VII.

"The Defendant is liable for and shall pay all debts of the parties accrued during the course of the marriage and as shown by the evidence, but the Defendant shall not be liable for any debts of the Plaintiff not shown of evidence at the trial or incurred after the commencement of this action except reasonable attorney fees incurred herein in amount not to exceed Two Thousand ($2,000) Dollars. All other costs are to be paid by the party that incurred the same."

Judgment was entered on May 18, 1979, and on May 21, 1979, Olga filed a notice of appeal. It is in regard to the above awards of alimony, child support, and the division of property, that Olga appeals to this court. Alvin has filed a cross-appeal, alleging that the division of property is erroneous because the trial court placed too much credence on a medical statement concerning the extent of Olga's physical disability.

The law in this area is quite clear. The applicable statute is Section 14–05–24 of the North Dakota Century Code, which provides:

"14–05–24. *Permanent alimony—Division of property.*—When a divorce is granted, the court shall make such equitable distribution of the real and personal property of the parties as may seem just and proper, and may compel either of the parties to provide for the maintenance of the children of the marriage, and to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively. The court from time to time may modify its orders in these respects."

Under Section 14–05–24, N.D.C.C., in determining the division of property, or in determining whether or not either party is entitled to alimony or child support, the trial court may consider the respective ages of the parties to the marriage; their earning abilities; the duration of and conduct of each during the marriage; their station in life; the circumstances and necessities of each; their health and physical condition; their financial circumstances as shown by the property owned at the time; its value at that time; its income-producing capacity, if any, and whether it was accumulated or acquired before or after the marriage; and such other matters as may be material. *Bender v. Bender,* 276 N.W.2d 695 (N.D. 1979); *Fischer v. Fischer,* 139 N.W.2d 845 (N.D.1966); *Ruff v. Ruff,* 78 N.D. 775, 52 N.W.2d 107 (1952).

Although we have never specifically said that the trial court must make an express finding as to each of the factors enumerated, we encourage trial courts to carefully

consider the *Ruff-Fischer* guidelines in equitably distributing the marital estate, and in determining awards of alimony and child support.

The trial court's determinations on matters of alimony, child support, and division of property are treated as findings of fact. *Nastrom v. Nastrom*, 284 N.W.2d 576 (N.D.1979); *Haugeberg v. Haugeberg*, 258 N.W.2d 657 (N.D.1977). The findings of fact will not be set aside on appeal unless they are clearly erroneous pursuant to Rule 52(a) of the North Dakota Rules of Civil Procedure. A finding of fact is deemed "clearly erroneous" when the reviewing court is left with a firm and definite conviction that a mistake has been made. *Haberstroh v. Haberstroh*, 258 N.W.2d 669 (N.D. 1977).

As we recently stated in *Nastrom v. Nastrom, supra,* our scope of review is limited by the clearly erroneous rule, and rightly so, for the trial judge is better able than we are "to ascertain the true facts by listening to and observing the demeanor of the witnesses." The mere fact that the appellate court might have viewed the facts differently, if it had been the initial trier of the case, does not entitle it to reverse the lower court. *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975).

Whether or not a particular finding is a finding of fact, which will not be set aside unless clearly erroneous, or whether or not it is a conclusion of law, which is fully reviewable on appeal, is to be determined by the reviewing court. Labels placed upon them by the trial court are not conclusive. *Rummel v. Rummel*, 265 N.W.2d 230 (N.D.1978).

With these considerations in mind, we shall review the trial court's findings in light of the *Ruff-Fischer* guidelines, to determine whether or not they are clearly erroneous.

First, there is not a sufficient variance in the ages of the parties to justify different treatment in the distribution of the marital estate. Both Alvin and Olga are in their mid-forties, so for purposes of the instant case, the importance of this factor is slight.

The second factor to consider is the earning ability of the parties. The record clearly shows that Alvin has the greater earning ability, and will be in a better position to support himself in the future than Olga.

Alvin is principally engaged in a business partnership known as B & C Company in Grand Forks, North Dakota. He has been involved in the heating business for approximately 17 years. Alvin also has a part ownership interest in the Bison Hotel Building in downtown Fargo, North Dakota, and a residuary interest in a business conducted by the parties' son, Larry, known as Broadway Furniture, also in Fargo. In addition, Alvin owns and manages a number of rental properties in Grand Forks which have produced a substantial amount of gross monthly rental income. Future monthly income is dependent upon periodic vacancies and city occupancy standards. Alvin had a gross income in 1977 of $16,660.

Olga, in contrast, was primarily engaged in raising the three children during the course of the marriage. In addition to her child-raising duties and homemaking tasks, Olga also participated in the management and operation of the various rental units the parties own in Grand Forks, and she worked as a licensed practical nurse in 1966 for nine months until their youngest child, Denise, was born.

During the years 1969 and 1970, Olga drove a potato truck during the fall harvest, and during 1975 through 1977, she operated a machine used to analyze the sugar content of beets at the American Crystal Sugar plant in East Grand Forks. This latter job was a sedentary-type job, and was only temporary in nature, lasting for two to three weeks during the harvest season.

Due to Olga's health problems, which will be discussed later, it is unlikely that she will be able to hold more than a part-time strictly sedentary job. Anything beyond that would be prohibited by her physical status. It is unlikely she will ever have an income comparable to that of her husband.

This difference in earning capacity must be taken into consideration in determining the division of property, especially when no alimony is awarded.

The next factor to be considered is the duration of the marriage, and the conduct of each during the marriage. The Bosmas had been married 26 years prior to the commencement of the divorce proceedings. The evidence shows that the parties had experienced marital problems for quite some time, and that matters worsened considerably following the birth of their youngest child.

At or around the time of Katherine's birth in 1955, the parties were medically advised of Olga's heart disorder. Olga decided, on the basis of the medical advice as to her heart condition, that she should not bear any more children. She proposed that Alvin have a vasectomy, but he refused. Thereupon, with one exception during the next eleven years preceding the commencement of this action, she declined to have sexual intercourse with her husband. During those years, their relationship continued to deteriorate.

In November of 1977, the parties purchased a second home in Grand Forks, and since that time they have been separated. It is undisputed that Alvin has been living with his girlfriend, Darlene Larson, at the former family residence, located at 902 22nd Avenue South, Grand Forks. An adulterous relationship with Miss Larson began in the latter part of 1976. However, the evidence also indicates that Olga, on a number of occasions, spent late night hours away from home, seeking the companionship and solace of persons outside the marriage.

The evidence supports the finding that during the summer of 1976, Olga took an extended vacation from Grand Forks to points in Iowa and Nebraska without Alvin being invited or present. Olga's traveling companion on that trip was one Sue Brandt, an 18-year-old girl. Suffice it to say that there was extensive testimony presented relative to Olga's social activities with Miss Brandt, a Mr. Klevgaard, and a Mr. Hauff, during the last two to three years preceding the commencement of this action.

Both parties have accused each other of marital infidelity, and for years, the parties have had little or no communication. The trial court could have reasonably concluded that both must share the responsibility for the breakdown of the marriage.

With reference to the conduct of the parties, Olga contends that the trial court erred in failing to grant her a divorce on the grounds of extreme cruelty. She argues that Alvin's conduct during the course of the marriage clearly constitutes extreme cruelty, and she specifically refers to the following:

(1) Alvin's admitted adulterous relationship with Darlene Larson;

(2) Alvin's failure to provide his wife with love and attention during the earlier years of the marriage, and his late night hours; and

(3) Alvin's selfish character and unfeeling attitude towards his wife's health, manifested by his refusal to have a vasectomy when he knew that further pregnancies would endanger her life.

Extreme cruelty, as defined by Section 14–05–05, N.D.C.C., is "the infliction by one party to the marriage of grievous bodily injury or grievous mental suffering upon the other."

A divorce may be granted in this state by reason of the infliction of grievous mental suffering, although such suffering produced no bodily injury. Section 14–05–03(2), N.D. C.C.; *Orwick v. Orwick*, 153 N.W.2d 795 (N.D.1967).

However, the question of whether or not one party to the marriage has inflicted grievous mental suffering upon the other is one of fact to be determined from all the circumstances of the case. The sensibilities of the litigants, their intelligence, viewpoints, sentiments, and health should be considered. *Orwick v. Orwick, supra; Bourrett v. Bourrett*, 99 N.W.2d 325 (N.D. 1959).

After carefully reviewing the entire record, we conclude that the trial court's finding, that a cause of action for divorce on the grounds of extreme cruelty was not established, is not "clearly erroneous" under Rule 52(a) of the North Dakota Rules of Civil Procedure. The judicial discretion of the trial court, in its determination of whether or not grievous mental suffering has been inflicted by one party upon the other, is entitled to great weight because of the presence of the parties before the presiding judge. We are not left with a firm and definite conviction that a mistake has been made as to this finding.

A factor of considerable importance in this case is the health and physical condition of the parties.

The record indicates that Alvin is in good health, and quite capable of maintaining his present standard of living. He is an able-bodied man possessed with the ability and means to provide for the reasonable support of his minor daughter, the plaintiff, and himself. On the contrary, the record clearly shows that Olga is plagued by health problems which originated a number of years ago.

Following the birth of Denise in 1967, Olga was advised that she should have heart surgery to correct a mitral valve deficiency. Open heart surgery was performed in Rochester, Minnesota, in July of 1974. The evidence indicates that due to her heart disease, Olga's capacity for physical activity is rather limited. She may be able to hold a part-time sedentary job, but anything beyond that would be prohibited by her physical status. Although Alvin strongly disputes the extent of her physical disability, there was no medical evidence presented at trial to the contrary.

That Olga has health problems, which may prevent her from obtaining and keeping gainful employment in the future, is significant in determining the property division, alimony and child support.

Of considerable dispute are the financial circumstances of the parties as shown by the property owned, and its value at the time of trial.

In determining the parties' net worth, the trial court incorporated in part defendant's exhibit "E" into its findings of fact, said exhibit being a tabulation of the parties' assets and liabilities:

"XIII.

"The following tabulation of property is largely taken from Defendant's Exhibit 'E', and such tabulation is taken to be true as a fact in this case:

| DATE ACQUIRED | BUSINESS RELATED | MONTHLY RENTAL INCOME | ASSET VALUE | LIABILITY | NET VALUE |
|---|---|---|---|---|---|
| NET VALUE OF PERSONAL PROPERTY OVER PERS. DEBTS & ACCTS. PAYABLE | | | | | $10,353.** |
| 1965 | 821 So. 19th St. Metropolitan FHA Taxes 8 months | 195. | $ 20,400. | $ 19,823. 870. 640. | ($ 933.) |
| 1973 | 808 Lincoln Drive Ken Woods Taxes 8 months | 320. | $ 37,800. | 5,592. 576. | $ 31,632 |
| | RESIDENTIAL UNITS | | | | |
| 1973 | 902–22nd Ave. South | 175. | $ 59,400. | $ 25,769. | $ 33,631. |
| 1977 | 3114 So. 10th Street | –0– | $ 65,200. | $ 55,190. | $ 10,010. |

| DATE ACQUIRED | BUSINESS RELATED RENTAL UNITS | RENTAL INCOME | ASSET VALUE | LIABILITY | NET VALUE |
|---|---|---|---|---|---|
| 1973 | 623 Lincoln Drive | 175. | $ 18,700. | $ 800. | $ 17,900. |
| 1972 | 416/418/420 Conklin Ave. | 510. | $ 49,500. | $ 8,344. | $ 41,156. |
| 1972 | 617 Lincoln Dr. | 320. | $ 34,200. | $ 22,749. | $ 11,451. |
| 1978 | 408 No. 7th St. | 430. | $ 30,300. | $ 22,952. | $ 7,348. |
| LAKE PROPERTY— MAPLE LAKE, MN. | | —0— | $ 17,000. | $ 88. | $ 16,912. |
| 1978—Lot So. of B & C | | —0— | $ 2,000. | $ 1,280. | $ 720. |
| TOTALS | | $2,125. | $334,500. | $164,673. | $169,827. |
| NOTE COMMUNITY NATIONAL BANK | | | | $ 2,000. | ($ 2,000.) |
| NOTE COMMUNITY NATIONAL BANK | | | | $ 5,000. | ($ 5,000.) |
| NOTE VALLEY BANK | | | | $ 3,000. | ($ 3,000.) |
| NOTE FIRST NATIONAL BANK | | | | $ 4,000. | ($ 4,000.) |
| ACCRUED INTEREST 9%, 8 months | | | | $ 928. | ($ 928.) |
| | | | | | $154,899. |
| | | | From line 1 above.** | | $ 10,353. |
| Partnership Equities 12–31–77 | | | | | |
| B & C Heating | | | $ 27,640. | | $ 27,640. |
| Bison Properties | | | $ 9,809. | ———— | $ 9,809. |
| TOTALS[1] | | | $398,849. | $192,148. | $202,701." |

Pursuant to the division of property ordered by the trial court, and using the values assigned to the property in defendant's exhibit "E", Olga received the following:

1. A 1976 Cadillac with a net value of $4,367;

2. A 1970 Chevrolet valued at $150;

3. All of the personal property and household goods in her possession, including the lumber for the fence at 3114 10th Street South in Grand Forks (value unknown);

4. The lake property at Maple Lake, Minnesota, valued at approximately $17,000;

5. A 1957 boat, motor, and trailer valued at $850;

6. A tractor valued at $800;

7. Tools and equipment located at the residence at 3114 10th Street South in Grand Forks, or at the lake property referred to above (value unknown);

8. The residence located at 3114 10th Street South, Grand Forks, with a net value of $10,010;

9. The rental units located at 416, 418, and 420 Conklin Avenue, Grand Forks, with a net value of $41,156; and

10. The rental unit located at 623 Lincoln Drive, Grand Forks, with a net value of $17,900.

In addition to dividing the property, the trial court awarded Olga:

1. Child support in the amount of $200 a month; and

2. The sum of $2,000 for attorney's fees.

The trial court also required Alvin to pay the installments on the note secured by the mortgage on the residence awarded to Olga at 3114 10th Street South, Grand Forks, as well as the taxes, special assessment, and

1. The totals represented in the asset value column ($398,849) and the liability column ($192,148) appear to be in error, and ought to read $382,302 and $179,601, respectively. Subtracting the latter figure from the former leaves a net value of $202,701, the figure which properly appears in the exhibit set forth herein.

fire insurance premiums on that property, through February 23, 1985.

Olga will be obligated to pay all the operating expenses, taxes, mortgage payments, etc., on the rental units she acquired pursuant to the division of property. She will also be liable for any debts not evidenced at trial or incurred after the commencement of the action, except reasonable attorney's fees in the amount of $2,000.

Alvin, on the other hand, was awarded "all other property of the marriage free and clear of the claims of the Plaintiff."

As adduced from defendant's exhibit "E", incorporated in part into the trial court's findings of fact and referred to herein, the net worth of the parties was found to be $202,701. Using the values assigned to property in defendant's exhibit "E", we find that Olga received approximately $92,-233 in value or 46% of the marital estate. This computation does not include the $200 a month for child support, the attorney's fees of $2,000, or the benefits derived from the expenditure required of Alvin relative to the residence at 3114 10th Street South in Grand Forks, through February 23, 1985. The rental units awarded to Olga return a gross monthly rental income of approximately $685 which will, of course, vary, dependent upon periodic vacancies and the city occupancy standards.

The major dispute, however, concerns the values attributable to (1) the property on Maple Lake in Minnesota; (2) Alvin's partnership interest in B & C Heating; (3) Alvin's interest in Bison Properties; and (4) the trial court's failure to consider the $11,-500 debt owed Alvin, and a $5,000 furniture credit he received, both items stemming from the sale of Alvin's interest in Broadway Furniture in Fargo. Olga contends that the division of property is clearly erroneous because of errors made regarding these particular assets. We shall analyze each of these contentions to determine its validity.

First, Olga contends that the trial court erred in assigning a value of $17,000 to the lake property owned by the parties, located on Maple Lake in Minnesota. It appears that in August of 1978, just shortly before the trial started, Alvin had valued the same property at $8,500. Subsequent to that time, Alvin testified that he had a realtor appraise the property, and the realtor stated that the lake property was worth approximately $17,000, so that was the value testified to at the time of trial. The only other evidence as to the value of this property was plaintiff's exhibit No. 12, a tax statement from the Polk County Auditor's office, which assigned a value to the property of $4,100 in 1978, and Olga's own testimony whereby she stated that the property was worth $8,000.

■ As we recently said in *Nastrom v. Nastrom, supra,* the general rule in cases of conflicting testimony, is that the reviewing court will give considerable weight to the findings of the trial court because the trial court is able to see and hear the witness, and we are not. The judge at the trial court level is in a much better position to accept one version of the facts over another because he is able to listen to and observe the demeanor of the witnesses, whereas this court, bound by a reading of the cold record, cannot do so. All due regard should be given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), N.D.R.Civ.P.

■ For these reasons, we cannot say that the values assigned to the B & C Heating Company and Bison Properties by the trial court are clearly erroneous. There is sufficient evidence in the record to support the finding that Alvin's interest in B & C Heating was $27,640, even though he had assigned a value to his interest in the same property of some $40,000 when attempting to obtain business loans from area financial institutions. Both figures were presented to the court, and for reasons previously stated in this opinion, we conclude that the trial court is more able to judge the credibility of the witnesses, weigh the evidence, and assign a true value to the property than we are.

A more difficult problem is presented when considering the value assigned to Alvin's interest in Bison Properties.

In the trial court's findings of fact at paragraph "XIII", which is a tabulation of property largely taken from defendant's exhibit "E", copied herein above, the court placed a value of $9,809 on Alvin's interest in Bison Properties. However, in the findings of fact at paragraph "X", the court, in discussing Alvin's ownership interest in Bison Properties, said:

"X.

" . . . The appraised value of this property is $221,000.00, with mortgages of $148,000.00 and a negative cash flow of $300.00 to $500.00 a month, by which rental income of the property is insufficient to maintain mortgage payments, taxes and upkeep on the building."

If Alvin owned one-half of Bison Properties, his interest should then be $221,000 minus $148,000, or $73,000 divided by two, or $36,500, not $9,809.

Counsel for Alvin conceded in his brief and during oral argument that the court did indeed err in this particular finding. However, counsel asserted that there was sufficient evidence in the record to support the trial court's finding that the value of Alvin's interest in Bison Properties was only $9,809, as set forth in defendant's exhibit "E", and incorporated in part into paragraph "XIII" of the findings of fact.

A perusal of the record indicates that Alvin and his son, Larry, purchased the Bison Properties i. e., the Bison Hotel Building, in April of 1974 for $44,000. Two separate appraisals of the property were introduced at trial. The first, an appraisal conducted by Dwyer Realty Company, valued the property at $211,000. A second, conducted by Metropolitan Federal Savings and Loan, valued the property at $148,000 after assuming that the second floor remodeling had been completed, which it had not. The cost to complete the remodeling was estimated by Alvin to be $40,000.

At trial, Alvin testified that loans, secured by mortgages on the building and other property, had been obtained for use in the remodeling venture or for operating capital. The loans were in the amounts of $40,000, $25,000, $20,000, and $5,000 respectively. All of the loans had been partially repaid, leaving a mortgage indebtedness on the property in the amount of approximately $88,000.

The record indicates that the trial court, confused by the testimony presented with respect to the true value of Bison Properties, conducted its own examination of the witness, Alvin Bosma. After thoroughly questioning Mr. Bosma about the value of the building and the amount of indebtedness on the property, the following colloquy took place:

"THE COURT: Deducting that amount leaves you a net equity after payment of those obligations of $17,100.00.

"MR. HAMILTON: But that again is assuming that there are no other obligations or debts.

"THE COURT: All right, it has to be divided into half between the two parties. Is it a 50/50 partnership?

"THE WITNESS: Yes.

"THE COURT: Thank you. That's all the questions I have."

At this point in the trial, the trial court concluded that the value of Alvin's interest in Bison Properties was one-half of $17,100, or $8,550. Defendant's exhibit "E" shows the value of the Bison Properties to be $9,809. A sum close to this figure can be reached by taking the $148,000 estimated value less the $40,000 estimated cost of remodeling of the second floor, leaving $108,000. Deducting the unpaid mortgages totaling $88,000 from this figure, we reach a balance of $20,000, in which Alvin has a one-half interest totaling $10,000. The maze of figures presented by both counsel created considerable confusion, but a reading of the record supports the trial court's ultimate determination within $191.

Finally, Olga contends that the court erred in dividing the property because it failed to consider an $11,500 debt owed to Alvin, and a $5,000 furniture credit, both assets stemming from the sale of Alvin's interest in Broadway Furniture. The trial

court did mention the $5,000 furniture credit balance in paragraph "X" of its findings of fact, but that figure is absent from defendant's exhibit "E" and paragraph "XIII" of the findings of fact, that being a tabulation of the parties' assets and liabilities. Furthermore, also unaccounted for in that tabulation is an $11,500 debt owed Alvin from one Blain Ress, said amount representing part of the sale price for Alvin's interest in Broadway Furniture, to be payable over a four-year-period. Having failed to consider these assets in its determination of the parties' net worth, the trial court's findings of fact at paragraph "XIII" are clearly erroneous.

Rather than order a new trial, it is our view that the judgment should be amended to award Olga the equivalent of one-half of that omitted property, or the sum of $8,250 to be paid over a four-year-period of time and bearing interest at six percent per annum. *Haugeberg v. Haugeberg, supra; See* Section 47–14–05, N.D.C.C.

Olga also contends that the trial court erred in failing to grant her alimony, instead providing that the income returnable from the rental units awarded her would be in lieu of an alimony award.

Pursuant to the division of property, Olga was awarded the rental unit located at 623 Lincoln Drive, and the units located at 416, 418, and 420 Conklin Drive, all in Grand Forks. An examination of defendant's exhibit "F" reveals that these rental units returned a gross monthly rental income of approximately $625 in 1977, and that the gross monthly rental income now appears to be $685. However, Olga will be obligated to pay all of the operating expenses, taxes, mortgage payments, etc., on these rental units. Defendant's exhibit "F" reveals that these units incurred monthly expenses of approximately $527 in 1977, leaving Olga with a net monthly gain of approximately $150 from these rental units. The income and expenses from these units will, of course, vary considerably from year to year, depending upon periodic vacancies, city occupancy standards, and other such factors as affect the rental market. As Olga will be acquiring equity in this property plus the $150 per month, will receive $200 a month in child support payments during the minority of the youngest child, will have a residence in which she may live without expenses until 1985, and, in the meantime, will be increasing her equity in this property, we cannot say that the trial court was clearly erroneous in not awarding Olga alimony.

For the reasons set forth in this opinion, the judgment of the district court is reversed as to omitted property, is otherwise affirmed, and is remanded for an amendment of the judgment consistent with this opinion. In so concluding, we have found the cross-appeal to be without merit. Costs on appeal shall be awarded to Olga.

SAND, PAULSON, PEDERSON and VANDE WALLE, JJ., concur.